1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   YUJUAN L. BANKS, JR.,                      No.  2:  14-cv-0460 TLN KJN P

12              Plaintiff,

13        v.                                    FINDINGS & RECOMMENDATIONS

14   U.C. REGENTS, et al.,

15              Defendants.

16

17        Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant

18   to 42 U.S.C. § 1983.  Pending before the court is defendants' summary judgment motion.  (ECF

19   No. 53.)  For the reasons stated herein, the undersigned recommends that defendants' motion be

20   granted.

21   Legal Standard for Summary Judgment

22        Summary judgment is appropriate when it is demonstrated that the standard set forth in

23   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

24   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

25   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

26        Under summary judgment practice, the moving party always bears the initial

27   responsibility of informing the district court of the basis for its motion, and identifying those

28   portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

1

1  together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

2  of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed.

3  R. Civ. P. 56(c)).

4       "Where the nonmoving party bears the burden of proof at trial, the moving party need

5  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

6  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

7  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

8  committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

9  burden of production may rely on a showing that a party who does have the trial burden cannot

10  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

11  should be entered, after adequate time for discovery and upon motion, against a party who fails to

12  make a showing sufficient to establish the existence of an element essential to that party's case,

13  and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

14  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

15  necessarily renders all other facts immaterial."  Id. at 323.

16       Consequently, if the moving party meets its initial responsibility, the burden then shifts to

17  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

18  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

19  establish the existence of such a factual dispute, the opposing party may not rely upon the

20  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

21  form of affidavits, and/or admissible discovery material in support of its contention that such a

22  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

23  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

24  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

25  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

26  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

27  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

28  (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

2

1    1564, 1575 (9th Cir. 1990).

2         In the endeavor to establish the existence of a factual dispute, the opposing party need not

3    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

4    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

5    trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

6    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

7    Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

8    amendments).

9         In resolving a summary judgment motion, the court examines the pleadings, depositions,

10   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

11   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

12   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

13   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

14   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

15   predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

16   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

17   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

18   some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

19   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

20   trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

21        By contemporaneous notice provided on June 10, 2014, (ECF No. 16), plaintiff was

22   advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

23   Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

24   Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

25   Plaintiff's Claims

26        This action is proceeding on the first amended complaint as to defendants Modjtahedi,

27   Morse and Stuber.  (ECF No. 23.)  All defendants are doctors employed by the University of

28   California at Davis Medical Center ("UCDMC").  At all relevant times, defendant Modjtahedi

3

1   and Stubers were "resident" doctors, and defendant Morse was their supervisor.  Plaintiff alleges

2   that defendants provided him with inadequate medical care in violation of state law and the

3   Eighth Amendment.  The undersigned summarizes plaintiff's claims herein.

4        Plaintiff alleges that on February 16, 2011, either defendant Modjthedi or Stuber injected

5   his left eye with a steroid to clear up an inflammation.  On February 22, 2011, after he had

6   returned to prison, plaintiff noticed that his left eye was blood shot and bleeding profusely on the

7   inside.

8        On March 2, 2011, plaintiff was taken to the UCDMC.  Doctors at UCDMC told plaintiff

9   that his left retina was loose.  Plaintiff signed paperwork authorizing surgery on his eye.  On April

10   12, 2011, plaintiff returned to UCDMC for surgery.  Plaintiff was given cataract surgery, but not

11   surgery for his retina.  Plaintiff was told that the retina in his left eye was too far gone for surgery

12   to repair it.

13        On May 25, 2011, plaintiff returned to UCDMC where he received another steroid

14   injection in his left eye.  Following this injection, his eye did not bleed profusely.

15        Plaintiff alleges that the defendant who performed the first injection on his eye on

16   February 16, 2011, did so "erroneously."  Plaintiff alleges that defendant Morse failed to

17   supervise the injection.  Plaintiff alleges that the injection caused his retina to detach, which later

18   resulted in him losing sight in his left eye.

19        Plaintiff alleges that in their attempt to cover-up the "erroneous" injection, defendants

20   delayed in providing plaintiff with any treatment for the injury they caused.  Plaintiff alleges that

21   defendants tried to cover-up the "erroneous" injection by telling him that the bleeding he suffered

22   in his eye following the injection was normal.  Plaintiff also alleges that defendants tried to cover-

23   up the "erroneous" injection by telling him that the detached retina was caused by an "old fight"

24   and there was nothing they could do.

25   Discussion—Eighth Amendment Claim:  Statute of Limitations

26        *Legal Standard*

27        Actions brought pursuant to 42 U.S.C. § 1983 are governed by the forum state's statute of

28   limitations for personal injury actions.  <u>Wilson v. Garcia</u>, 471 U.S. 261, 265 (1985); <u>Jones v.

4

1    Blanas, 393 F.3d 918, 927 (9th Cir. 2004).  The statute of limitations for civil actions filed in

2    California is two years, as set forth at California Civil Procedure Code Section 335.1, which is the

3    applicable statute in § 1983 actions.  See Maldonado v. Harris, 370 F.3d 945, 954 (9th Cir. 2004).

4    The federal court also applies the forum state's laws regarding tolling, including equitable tolling

5    when not in conflict with federal law.  Hardin v. Straub, 490 U.S. 536, 537–39 (1989); Fink v.

6    Shedler, 192 F.3d 911, 914 (9th Cir. 1999).  California provides that the applicable limitations

7    period is tolled for two years on grounds of "disability" when a litigant is incarcerated for a term

8    less than life.[1]  Cal .Code Civ. P. § 352.1(a).  This tolling provision operates to delay the running

9    of the limitations period. Carlson v. Blatt, 87 Cal.App. 4th 646, 650 (2001) (imprisonment tolls

10   running of limitations period for two years from accrual of cause of action); Johnson v. State of

11   California, 207 F.3d 650, 654 (9th Cir. 2000).  Accordingly, California inmates have a total of

12   four years from the accrual of a cause of action to file a complaint.

13        It is federal law, however, that determines when a cause of action accrues and the statute

14   of limitations begins to run in a § 1983 action.  Wallace v. Kato, 549 U.S. 384, 388 (2007); Elliott

15   v. City of Union City, 25 F.3d 800, 801–02 (9th Cir. 1994).  Under federal law, a claim generally

16   accrues when the plaintiff knows or has reason to know of the injury which is the basis of the

17   action.  See TwoRivers v. Lewis, 174 F.3d 987, 991–92 (9th Cir. 1999). The applicable statute of

18   limitations period is tolled while the prisoner completes the mandatory exhaustion process.

19   Brown v. Valoff, 422 F.3d 926, 943 (9th Cir. 2005).

20        *Analysis*

21        Citing California Code of Civil Procedure § 335.1, defendants argue that plaintiff had two

22   years from the date he discovered his injury in April 2011 to file a timely civil rights action.

23   Defendants argue that the instant action, filed on February 12, 2014, is not timely because it was

24   not filed within two years of April 2011.

25        In calculating the statute of limitations, defendants omit the two years of tolling to which

26   plaintiff is entitled under California Code of Civil Procedure § 352.1(a).  Thus, plaintiff had four

27   _____

28   [1]  Defendants do not argue that section 352.1 is not applicable to plaintiff based on the length of
     his sentence.

1    years from April 2011 to file a timely civil rights action.  The instant civil rights action is not

2    barred by the statute of limitations because it was filed within four years of April 2011.

3    Accordingly, defendants' motion for summary judgment on this ground should be denied.

4    Discussion—Eighth Amendment Claim:  Merits

5        *Legal Standard*

6        To succeed on an Eighth Amendment claim predicated on the denial of medical care, a

7    plaintiff must establish that he had a serious medical need and that the defendant's response to

8    that need was deliberately indifferent.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); see

9    also Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A serious medical need exists if the failure to

10   treat the condition could result in further significant injury or the unnecessary and wanton

11   infliction of pain.  Jett, 439 F.3d at 1096.  Deliberate indifference may be shown by the denial,

12   delay, or intentional interference with medical treatment, or by the way in which medical care is

13   provided.  Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988).

14       To act with deliberate indifference, a prison official must both be aware of facts from

15   which the inference could be drawn that a substantial risk of serious harm exists, and he must also

16   draw the inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Thus, a defendant is liable if

17   he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing

18   to take reasonable measures to abate it."  Id. at 847.  A physician need not fail to treat an inmate

19   altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial,

20   884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition,

21   even if some treatment is prescribed, may constitute deliberate indifference in a particular case.

22   Id.

23       It is important to differentiate common law negligence claims of malpractice from claims

24   predicated on violations of the Eighth Amendment's prohibition of cruel and unusual punishment.

25   In asserting the latter, "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not

26   support this cause of action."  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir.

27   1980) (citing Estelle, 429 U.S. at 105-06).

28   ////

6

*Analysis*

Plaintiff claims that the February 16, 2011 steroid injection caused his retinal detachment, and that the detached retina caused him to lose vision in his left eye.  Plaintiff argues that the injection was not medically warranted based on the condition of his left eye.  Plaintiff also suggests that the injection was improperly performed because defendants used the wrong size needle during the procedure.  Plaintiff argues that the bleeding in his eye following the injection demonstrates that the injection was improperly performed.

Defendants argue that they did not act with deliberate indifference and that the February 16, 2011 injection did not cause the retinal detachment.  In support of this argument, defendants rely primarily on the declaration of defendant Morse.

In relevant part, defendant Morse's declaration is set forth herein:

> 1.  I am a professor at the University of California Davis Medical Center.  My specialty is ophthalmology and my subspecialty is vitreo-retinal disease including retinal surgery.  I am a graduate of University of California Los Angeles Medical School.  I performed my residency specialty training at the Jules Stein Eye Institute at the same institution.   That training qualified me to practice ophthalmology and was the level of academic education required to meet the qualifications of the American Board of Ophthalmology.  However, I elected to seek additional education in the specialty and completed a fellowship in Retinal  Surgery at Duke University.  With that level of education, training and experience, I came to UCDMC and joined the faculty.  I am now a full professor and am Director of the Vitreo-Retinal Service.

> 2. As a professor in the School of Medicine at UCDMC, I have multiple responsibilities.  I am involved in teaching both of medical students and of those who have completed medical school, primarily residents in ophthalmology and post residency fellows focusing on retinal surgery.   I perform and participate in the performance of numerous retinal surgeries each month.  I have performed thousands of such surgeries in my career.  I presently am involved as the primary surgeon or supervising surgeon in at least one hundred fifty or more surgeries each year.  A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

> 3.  As a faculty member at a public health institution, I attempt to provide care to those who need it without regard to related life experiences.  I attempt not to discriminate or even to be judgmental about my patients.  As such, I treat patients who are incarcerated for committing crimes or awaiting trial because they have been charged with committing crimes.   I never ask, because I do not want to know, what crimes they have allegedly committed.  I also try to share this philosophy with those who I teach and train.  I did not

know what crime Mr. Yujean Banks had been convicted of when I was involved in his care in 2011. We treat all patients the same.

4.   There are challenges beyond the control of the physician involved in treating incarcerated patients.   One of the most significant is that for security reasons it is difficult to schedule specific appointments and set schedules for their care because the correctional system maintains much flexibility to avoid predictability.   For example, we cannot rely on their returning for scheduled postoperative appointments. Despite such challenges, we try our best to provide care to such individuals including Mr. Banks.

5.   I was the faculty member at UCDMC who was primarily involved in Mr. Banks' care.   In addition, he was seen by other licensed physicians including ophthalmology residents and fellows. I was present for much of his care.   I discussed his medical condition and treatment with the other physicians, and I reviewed the notes and records of those physicians who I was supervising while providing care to Mr. Banks, including Sara Modjtahedi, M.D. Christianna Stuber, M.D., Saaidia Rashid, M.D., and Nanfei Zhang. M.D.

6. When Mr. Banks first presented to our department in February 2011, his primary complaint was loss of a significant amount of vision in his left eye.  He had already developed a cataract on the lens of that eye.  In addition and of more concern, he was suffering from an inflammatory process inside his left eye.  This process was generally described as vitritis and granulomatous uveitis.   This means that there was an inflammatory process internally inside his eye.  It does not describe the cause.

7.   There is apparently some significance in this case related to events possibly precipitating the condition known as uveitis.  The ultimate diagnosis was chronic granulomatous uveitis.  When any patient presents with uveitis or vitritis, we attempt to determine the cause if possible as the cause may have some effect on treatment. At the most basic level, we want to know if possible whether the patient suffers from an infection or from another immunological cause.  We want to rule out infection to the extent we can.  Many infections are treatable and need to be ruled out before using steroids in treating the inflammation.  Most commonly, no specific cause can be identified.  But we generally try to identify such a cause.  There are laboratory tests that are helpful in ruling in and ruling out some causes.

8.  On the occasion of Mr. Banks' first visit to UCDMC, we had some records from the prison and from a local ophthalmologist in Crescent City or Eureka.   Some tests had been performed to determine some of the possible causes but not all.  We elected to perform additional tests at our facility as that would be more expeditious than trying to track down and obtain records of other providers or sending him back to the prison to have tests performed there.  The tests we ordered were performed and the results later became available.  No specific cause of the uveitis was revealed by

8

1    those tests.

2    9.   One of the standard forms of treatment for uveitis is to use
     steroid injections to try to reduce and hopefully resolve the
3    inflammatory reaction that is within the globe.  For Mr. Banks, the
     decision was made to perform a subtenon injection of Kenalog.
4    This is not an injection into the globe.  It is an injection into the
     subtenon space outside the eye.  The steroid, Kenalog, is injected
5    outside the globe in an area of blood supply to the globe so that the
     steroid can get inside and hopefully mitigate or eliminate the impact
6    [of] the inflammatory process.  Dr. Christianna Stuber, a fourth year
     resident in ophthalmology already trained and experienced in
7    performing subtenon injections, administered that injection to Mr.
     Banks on February 16, 2011, after applying a topical anesthetic to
8    the surface of the globe and a local anesthetic to the subtenon space.
     Her record specifically states that she did not pierce the sclera, the
9    white part of the globe.

10   10.   It should be noted that some ophthalmologists prefer
     performing the Kenalog injection directly into the vitreous which is
11   within the globe.  In some circumstances injection of Kenalog
     directly into the globe is intended.   There was no such intention
12   here and no indication that the injection invaded the globe.

13   11.  I understand that Mr. Banks has contended that the needle used
     by Dr. Stuber (who is not a nurse as alleged in the complaint) was
14   too large.  Her notes indicate she used a 30 gauge needle.  Mr.
     Banks noted that three months later when another injection was
15   administered a 27 gauge needle was used.  Mr. Banks apparently
     believes that the second needle was smaller.  In reality a 30 gauge
16   needle is smaller than a 27 gauge needle.  Regardless, both are
     appropriate and acceptable sizes for this type of injection.  The
17   choice is largely a matter of physician preference.

18   12.  A common side effect of a subtenon injection is redness in the
     eye.  Occasionally there will be subconjunctival bleeding by which
19   some red blood diffuses through the space between the transparent
     layer of tissue (conjunctiva) that lays over the globe and the white
20   surface tissue (the sclera) that is usually seen through the
     conjunctiva.  The redness can increase for several days following
21   the injection.  Even when this was a subconjunctival bleeding, such
     bleeding is usually benign and rarely has any significance other
22   than its temporary appearance.  We invariably see some form of a
     "blood shot" appearing eye several days after the injection.  On
23   occasion we see evidence of a subconjunctival bleed which is a
     brighter red.  Again, this is almost always benign and does not
24   require treatment.  It does not cause retinal detachments.

25   13.   Mr. Banks has alleged that as a result of the injection on
     February 16, 2011, his globe filled with blood.  I saw Mr. Banks at
26   each of his visits to UCDMC and I never saw anything suggesting
     that the globe had filled with blood or had any internal bleeding at
27   any time as Mr. Banks alleges.

28   ////

14.  On the occasion of his first visit to UCDMC, we were unable to visualize the back of his eye where the retina with the macula and the optic nerve are located.  They could not be visualized because of the cataract and because of the inflammation inside the globe.  A type of ultrasound was performed.  My interpretation of that scan was noted as:   "OS [left eye]:   retina attached; + vitritis with posterior vitreous detachment, tractional RD [retinal detachment] noted."  While the macula, which is the visual center, appeared on the ultrasound to be still attached, the notation of a peripheral tractional retinal detachment means that there was a chronic problem associated with the inflammatory process that is potentially significant but does not present an emergency requiring surgery.

15.   Mr. Banks returned to UCDMC on March 2nd for an unscheduled visit.  At that time he reported he had experienced visual flashes a couple of days before and then woke up on the morning of March 2nd with almost no vision in his left eye.  Dr. Sara Modjtahedi was the retinal fellow who first evaluated Mr. Banks in the ophthalmology clinic that day.  Her impressions, which I reviewed and with which I concurred, included that Mr. Banks had a retinal detachment which then included the macula. Her recommendation was that there be an attempt at retinal reattachment surgery with a lensectomy for the cataract and consideration of a possible vitreous biopsy at that time.   She projected the surgery could be performed in one to three weeks.

16.  A retinal detachment due to traction does not present the same type of urgency as do some types of retinal detachments.

17.  Mr. Banks returned on March 21, 2011.  At that time an additional preoperative evaluation was again conducted including taking ultrasound measurements to calculate the power of the intraocular lens implant that would be implanted when the natural lens with the cataract was removed.

18.  On April 12, 2011, Mr. Banks was taken to surgery.  The first part of the surgery involved removal of the cataract and implantation of the artificial lens.   Dr. Stuber was the senior resident on that part of the surgery along with Dr. Kim, who was the faculty member for that part of the surgery.  By all appearances, that aspect of the surgery went well.  When that part of the surgery was completed, I and Dr. Rashid took over and addressed the posterior eye issues including the vitreous, retina and optic nerve. With the cataract gone, I and Dr. Rashid were able to observe, using an instrument called an indirect ophthalmoscope, that the retina was totally detached.   We also observed that there was extensive proliferation vitreoretinopathy with optic atrophy and sclerotic retinal vessels with poor blood flow.   The retinal detachment was tractional having been caused by the inflammatory process that caused the uveitis.  That process caused adhesions/scar tissue that pulled the retina and macula off the back of the eye where they received their blood supply.  The optic atrophy manifested in part by its pallor that there was no likely potential, in my opinion, to restore additional vision to the left eye.  The nerve was not going to

10

be capable of transmitting pictures to the brain.  I decided that the planned retinal surgery should not be initiated due to the absence of any reasonable likelihood of success.   Accordingly, no retinal surgery was performed.

19.   Mr. Banks' vision in his left eye was lost before Dr. Modjtahedi and Dr. Rashid and Dr. Zhang ever saw this patient. There was nothing that, in my opinion, could or should have been done by them that would have affected Mr. Banks' outcome in that regard.  In fact, I do not believe that given the tractional retinal detachment from chronic granulomatous uveitis, the atrophy of the optic nerve, and the extensive vitreoretinopathy that there was anything that could have been done at any time to save his vision.

20.   There is no reasonable medical possibility, let alone probability, that the posterior subtenon injection performed on February [16],[2] 2011 by Dr. Stuber caused or contributed to the retinal detachment.   There is absolutely no question that the subtenon injection performed by Dr. Zhang on May 25, 2011 had anything to do with Mr. Banks' vision loss at all.  It was performed to treat the inflammation and try to preserve vision.

21.  I attempted to explain to Mr. Banks and observed the other physicians in ophthalmology explaining in lay terms the processes causing his vision problems, the plan to attempt to address them medically and surgically, and the reason for the poor outcome. There was no attempt to hide or cover up anything be it an alleged mistake or misjudgment.  The physicians involved did not cause the retinal detachment.   Mr. Banks did not have the type of retinal detachment that presents as an emergency and which a retinal surgeon might want to take the patient to surgery to attempt reattachment as soon as possible.

22.  From my review of the records and from my observations as a participant in his care, I believe Mr. Banks received appropriate care within the standards of the ophthalmology community under the conditions presented.  His complaints were never ignored and the vision in his left eye, let alone any aspect of his health, was not ignored.  I did not observe and do not believe that his globe ever filled with blood.  I do not believe that I or any of the other defendants ignored his complaints.   No retinal surgery was performed.   Had we known his apparent disagreement with our opinions, we would have provided another opinion for him.

(ECF No. 53-4 at 1-7.)

In his declaration, defendant Morse states that plaintiff returned to UCDMC on March 2, 2011, for an "unscheduled visit."  The undersigned clarifies that plaintiff was taken to the

---

[2]   In paragraph 20 of his declaration, defendant Morse identifies the date of the injection as February 9, 2011.  It is clear that defendant Morse meant to identify the date of the injection as February 16, 2011.

1    UCDMC Emergency Room on that date.  Attached to plaintiff's opposition are medical records

2    stating that on March 2, 2011, plaintiff was taken to the UCDMC Emergency Room based on

3    complaints of increased pain in his left eye.  (ECF No. 61 at 11, 13.)  Plaintiff also complained

4    that he had no vision in his left eye.  (Id. at 11.)

5         Defendants have presented expert evidence, i.e., defendant Morse's declaration, that the

6    Kenalog injection plaintiff received on February 16, 2011, was within the standard of care.

7    Defendants have also presented expert evidence, through defendant Morse's declaration, that the

8    Kenalog injection was properly performed and did not cause the detached retina or plaintiff's loss

9    of vision in his left eye.

10        After reviewing plaintiff's opposition, the undersigned finds that plaintiff has presented no

11   expert evidence demonstrating that the February 16, 2011 injection was not medically warranted

12   or that it was improperly performed.  Even if plaintiff were able to present expert evidence that

13   the injection should not have been performed because it increased the likelihood of him suffering

14   from a detached retina, as he argues, plaintiff would still not have demonstrated an Eighth

15   Amendment violation.  Instead, plaintiff would have demonstrated a difference of opinion

16   between medical professionals regarding plaintiff's need for the injection.  "A difference of

17   opinion between a physician and the prisoner – or between medical professionals – concerning

18   what medical care is appropriate does not amount to deliberate indifference."  Snow v. McDaniel,

19   681 F.3d at 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)),

20   overruled in part on other grounds, Peralta v. Dillard, 744 F.3d at 1082-83; Wilhelm v. Rotman,

21   680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986).)

22        In support of his opposition, plaintiff has provided his own declaration and exhibits A-I.

23   For the reasons discussed herein, the undersigned finds that plaintiff's declaration and exhibits do

24   not meet plaintiff's burden in opposing defendants' summary judgment motion.

25        *Plaintiff's Declaration*

26        The undersigned has considered the information in plaintiff's declaration to the extent it is

27   based on his personal knowledge.  (ECF No. 59.)  However, plaintiff is not a medical expert.  For

28   that reason, the statements in plaintiff's declaration which are not based on personal knowledge

12

1   and require expert testimony are disregarded.  For example, plaintiff's statement in his declaration

2   that a 30 gauge needle was not an appropriate size for the February 16, 2011 Kenalog injection

3   (id. at 3) is disregarded because only a medical expert may testify regarding the appropriate size

4   needle required for this injection.

5          *Exhibit A*

6          Plaintiff's Exhibit A includes some of plaintiff's medical records.  (ECF No. 61 at 3-16.)

7   Defendants object to these records on grounds that they are not authenticated and contain

8   inadmissible hearsay.  (ECF No. 63 at 2.)

9          Although the medical records submitted by plaintiff have not been authenticated, the

10  undersigned considers them to the extent they are relevant because they could be made admissible

11  at trial.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be

12  made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii

13  Dep't of Pub. Safety, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district court abused its discretion

14  in not considering plaintiff's evidence at summary judgment, "which consisted primarily of

15  litigation and administrative documents involving another prisoner and letters from other

16  prisoners" which evidence could be made admissible at trial through the other inmates'

17  testimony at trial).

18         Plaintiff argues that the ophthalmologist he saw prior to seeing defendants recommended

19  that plaintiff take oral steroids and not intraocular steroids.  (ECF No. 58 at 19.)  In Exhibit A,

20  plaintiff has provided letters dated January 27, 2011, and February 2, 2011, from Dr. Cochrane,

21  an ophthalmologist in Crescent City, California, addressed to "Dear Doctors."  (ECF No. 61 at 5-

22  6.)  The undersigned assumes that these letters are addressed to the doctors at Pelican Bay State

23  Prison ("PBSP"), where plaintiff was housed.

24         In the letter dated January 27, 2011, Dr. Cochrane states, in relevant part, that anterior

25  examination of the left eye showed a "ciliary flush, 1+ injection of the bulbar conjunctiva, 3+ cell

26  and flare reaction along with a classic appearance of granulomatous mutton-fat keratic

27  precipitates on the inferior cornea.  There was also evidence of posterior synechia…The left eye

28  showed a flat retina, but no details were seen."  (Id. at 61.)  Dr. Cochrane recommended several

                                          13

1    tests, eye drops and a follow-up appointment.  (Id.)

2         In the February 2, 2011 letter, Dr. Cochrane wrote that plaintiff reported that his vision

3    was slightly better and he was able to make out objects up close a little bit better.  (Id. at 62.)  Dr.

4    Cochrane wrote that "there does appear to be significant vitreous inflammation in the left eye,

5    however, there are essentially no retina details.  It is difficult to determine if there is any retinal or

6    choroidal involvement."  (Id.)  Dr. Cochrane recommended a retina evaluation to "determine

7    whether or not a vitrectomy or biopsy would be considered, considering the density of his

8    inflammation."  (Id.)  He also recommended that plaintiff continue taking the eye drops.  (Id.)  He

9    also wrote that plaintiff "may need oral steroids, but oral steroids may not be able to be started

10   until we have ruled out infectious causes of this uveitis."  (Id.)

11        Contrary to plaintiff's claims, Dr. Cochrane's letters do not suggest that the more

12   conservative treatment he provided plaintiff, i.e., eye drops and the recommendation of oral

13   steroids, precluded the Kenalog injection given by defendants.  While Dr. Cochrane

14   recommended that plaintiff start receiving oral steroids, his letters did not rule out the possibility

15   of plaintiff receiving steroids by injection.  For these reasons, the undersigned finds that

16   plaintiff's argument that Dr. Cochrane's letters prove that defendants provided constitutionally

17   inadequate medical care is not persuasive.

18        Plaintiff has also provided a form titled "Pelican Bay State Prison RN Follow Up Visit,"

19   dated February 7, 2011.  (Id. at 7.)  This form contains a note by a nurse stating,

20              I/P's left eye has some cataract involvement but has greatly
             improved since my last assessment on 1/18/11.  No crusting or
21           drainage.  No obvious signs of infection. I/P states that vision is
             much better but that he cannot read out of the left eye yet.  I/P states
22           after he started taking the medication he noticed an improvement
             immediately.  He states he can see objects but they still seem fuzzy.
23           I/P states he is compliant with medication.

24   (Id.)

25        Plaintiff appears to argue that the notes by the nurse, quoted above, indicate that the

26   conservative treatment ordered by Dr. Cochrane was effective and that he did not need the

27   Kenalog injection.  As discussed above, Dr. Cochrane recommended a retina evaluation, which is

28   apparently why plaintiff was sent to UCDMC.  Defendants have presented expert evidence that

                                            14

1    the Kenalog injection was medically warranted because plaintiff had an inflammatory process in

2    his left eye, i.e., vitritis and granulomatous uveitis.  While plaintiff's sight may have improved,

3    the nurse's February 7, 2011 note does not establish the plaintiff's eye was no longer inflamed or

4    that the Kenalog injection was not medically warranted.

5            Plaintiff also argues that the bleeding in his left eye following the February 16, 2011

6    injection demonstrates that it was improperly performed.  In his declaration submitted in support

7    of his opposition, plaintiff states that on February 22, 2011, he noticed that his left eye was

8    "blood shot red (bleeding profusely in the inside of my eye)."  (ECF No. 59 at 1.)  Plaintiff has

9    provided a medical record from February 22, 2011, signed by a doctor in the prison describing

10   plaintiff's left eye as having a "subconjunctival hemorrhage."  (ECF No. 61 at 9.)  The note also

11   states that plaintiff reported no vision loss.  (<u>Id.</u>)  The doctor advised plaintiff to avoid strenuous

12   physical activity and to return to the clinic in 7 days for a follow up.  (<u>Id.</u>)

13           A subconjunctival hemorrhage "occurs when a tiny blood vessel breaks just underneath

14   the clear surface of your eye (conjunctiva)."  http://www.mayoclinic.org/diseases-

15   conditions/subconjunctival-hemorrhage/basics/definition/con-20029242.  As discussed above,

16   defendant Morse stated that subconjunctival bleeding is a common side effect of a subtenon

17   injection.  The prison doctor's description of plaintiff's left eye as having a "subconjunctival

18   hemorrhage" appears consistent with defendant Morse's description of this side effect.

19   Therefore, while plaintiff alleges that his eye was "profusely bleeding in the inside," the medical

20   records do not support this claim.  In his declaration, defendant Morse also states that he did not

21   see any internal bleeding in plaintiff's eye.  Plaintiff's claim that he suffered internal bleeding in

22   his left eye, i.e., more than subconjunctival bleeding, is not supported by the record.

23           *Exhibit B*

24           In his opposition, plaintiff argues that he has evidence that Kenalog injections can cause

25   detached retinas.  Attached to plaintiff's opposition as Exhibit B is material from a National

26   Institute of Health ("NIH") website, dated September 11, 2013, regarding Kenalog injections.

27   (ECF No. 61 at 17-37.)  Defendants object to this material on grounds that it is unauthenticated

28   and constitutes inadmissible hearsay.  (ECF No. 63 at 3.)

Defendants' objections to the NIH report are well taken, as it is unlikely that the NIH report would be admissible at trial.  However, for the reasons discussed herein, the undersigned finds that the NIH report does meet plaintiff's burden of opposing defendants' summary judgment motion.

The section of this material addressing the "ophthalmic" use of Kenalog injections states, in relevant part,

> Use of corticosterioids may produce posterior subcapsular cataracts, glaucoma with possible damage to the optic nerves, and may enhance the establishment of secondary ocular infections due to bacteria, fungi or viruses.  The use of oral corticosteroids is not recommended in the treatment of optic neuritis which may lead to an increase in the risk of new episodes.  Corticosteroids should not be used in active ocular herpes simplex.

> Adequate studies to demonstrate the safety of Kenalog Injection use by intraturbinal, subconjunctival, sub-Tenons, retrobulbar, and intraocular (intravitreal) injections have not been performed. Endophthalmitis, eye inflammation, increased intraocular pressure, and visual disturbances including vision loss have been reported with intravitreal administration.    Administration of Kenalog Injection intraocularlly or into the nasal turbinates is not recommended.

> Intraocular injection of corticosteroid formulations containing benzyl alcohol, such as Kenalog Injection, is not recommended because of potential toxicity from the benzyl alcohol.

(Id. at 29.)

The section quoted above does not state that subtenon injections of Kenalog can cause detached retinas.  While the section does state that vision loss has been reported with intravitreal administration, i.e., an injection directly into the eye, plaintiff did not receive an intravitreal injection.  Plaintiff received a subtenon injection, i.e., an injection into the subtenon space outside of the eye.

Plaintiff also argues that the NIH materials identify blindness as one of the potential risks of Kenalog injections.  In a later section, the materials list the adverse reactions to ophthalmic corticosteroid therapy as, "exophthalmos, glaucoma, increased intraocular pressure, posterior subcapsular cataracts, rare instances of blindness associated with periocular injections."  (Id. at 61.)  It is unclear to the undersigned whether a periocular injection is the same as a subtenon

16

1    injection.  However, the undersigned also observes that at his deposition, plaintiff was asked if he

2    understood that the consent form he signed prior to the injection listed blindness as a potential

3    risk.  (Plaintiff's Deposition at 25-26.)

4           Plaintiff's deposition, and the NIH materials, suggests that blindness is a potential risk of

5    a Kenalog injection.  However, plaintiff has presented no expert evidence that the risk of

6    blindness allegedly posed by a subtenon Kenalog injection is created by the possibility of the

7    injection causing a detached retina.   Plaintiff has also presented no expert evidence that *his*

8    detached retina was caused by the Kenalog injection.  According to defendant Morse, there was

9    no reasonable medical possibility, let alone probability, that the injection plaintiff received caused

10   or contributed to the detachment.  (ECF No. 53-4 at 6.)  According to defendant Morse, the

11   detached retina was caused by chronic granulomatous uveitis.  (Id.)   For these reasons, the

12   undersigned finds that plaintiff's deposition and the NIH materials do not demonstrate that the

13   blindness he suffered was caused by the Kenalog injection he received.

14          Plaintiff also argues that the NIH materials state that Kenalog injections should not be

15   used in "acute stress situations."  (ECF No. 58 at 19.)  The NIH materials state, in relevant part,

16              Increased dosage of rapidly acting corticosteroids is indicated in
                patients on corticosteroid therapy subjected to any unusual stress
17              before, during and after the stressful situation.   Kenalog-40
                Injection is a long-acting preparation, and is not suitable for use in
18              acute   stress   situations.     To   avoid   drug-induced   adrenal
                insufficiently, supportive dosage may be required in times of stress
19              (such as trauma, surgery or severe illness) both during treatment
                with Kenalog-40 Injection and for a year afterwards.
20

21   (ECF No. 61 at 27.)

22          Plaintiff's argument appears to be that he should not have been given the Kenalog

23   injection because he was in an acute stress situation prior to the injection.  The section quoted

24   above describes acute stress situations as trauma, surgery or severe illness.  Plaintiff has presented

25   no evidence that he suffered from trauma, surgery or severe illness prior to receiving the Kenalog

26   injection.  Moreover, the section above suggests that Kenalog injections may not be effective for

27   patients suffering from acute stress, not that the Kenalog injections may cause harm.

28   ////

1    Plaintiff also argues that defendants failed to advise him of all of the potential risks from

2  Kenalog injections listed in the NIH materials, such as ocular infections.  (ECF No. 58 at 19.)

3  Plaintiff's complaint does not allege that defendants failed to properly advise him of the risks of

4  the injection.  However, assuming that these allegations state a cognizable Eighth Amendment

5  claim, plaintiff has not demonstrated that his failure to be advised of all of the possible side

6  effects of the Kenalog injection caused his injuries.  See Jett v. Penner, 439 F.3d 1091, 1096 (9th

7  Cir. 2006) (to establish deliberate indifference, plaintiff must demonstrate that the harm was

8  caused by the indifference).

9    In his opposition, plaintiff also argues that "strict aseptic technique was not applied, as is

10  required when performing Kenalog 40 injections."  (ECF No. 58 at 29.)  In support of this claim,

11  plaintiff cites a portion of the NIH materials stating that,

12
> Strict Aseptic Technique is Mandatory.  The vial should be shaken
> before use to ensure a uniform suspension.  Prior to withdrawal, the
13
> suspension should be inspected for clumping or granular
> appearance (agglomeration).  An agglomerated product results from
14
> exposure to freezing temperatures and should not be used.  After
> withdrawal, Kenalog 40 Injection should be injected without delay
15
> to prevent settling in the syringe.  Careful technique should be
> employed to avoid the possibility of entering a blood vessel or
16
> introducing infection.

17  (ECF No. 61 at 36.)

18    Plaintiff has underlined the last sentence of the section quoted above.  (Id.)  Thus, plaintiff

19  appears to argue that the Kenalog entered a blood vessel in his eye and caused an infection due to

20  defendants' failure to follow "strict aseptic technique."   Plaintiff has offered no expert evidence

21  demonstrating that defendants did not follow strict aseptic technique.

22    *Exhibit C*

23    Plaintiff's exhibit C includes plaintiff's medical records from the UCDMC, several of

24  which are electronically signed by defendants.  (ECF No. 61 at 39-51.)  Defendants object to

25  these records on grounds that they are not authenticated and contain inadmissible hearsay.  (ECF

26  No. 63 at 3.)

27    Although these records have not been authenticated, the undersigned considers them to the

28  extent they are relevant because they could be made admissible at trial.  See Fraser v. Goodale,

18

342 F.3d 1032, 1036 (9th Cir. 2003).  The undersigned has reviewed these records and finds that they do not demonstrate deliberate indifference by the defendants.

*Exhibit D*

Plaintiff's exhibit D includes reports by Dr. Oliva, a private ophthalmologist who examined plaintiff in October 2011.  (ECF No. 61 at 53-61.)  Defendants object to these reports on the grounds that they are not authenticated and contain inadmissible hearsay.  (ECF No. 63 at 3.)  Although these records have not been authenticated, the undersigned will consider them to the extent they are relevant because they could be made admissible at trial.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).

In his opposition, plaintiff alleges that Dr. Oliva told him that the sight in his left eye could have been saved had he received immediate surgery to reattach the partially detached retina seen in the February 9, 2011 ultrasound.  (ECF No. 58 at 26.)  Plaintiff's exhibit D includes reports prepared by Dr. Oliva from the Medical Eye Center in Grants Pass, Oregon, from his examinations of plaintiff on October 18, 2011, and November 1, 2011.  (ECF No. 61 at 55-61.)  These letters do not state that the sight in plaintiff's left eye could have been saved had plaintiff received surgery sooner.  Plaintiff's claim that Dr. Oliva told him that immediate surgery would have saved the sight in his left eye is unsupported by any admissible evidence.

*Exhibit E*

Plaintiff's Exhibit E is his amended complaint.  (ECF No. 61 at 63-81.)  Defendants do not object to plaintiff's amended complaint.  "A [p]laintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence."  Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).  Plaintiff's verified amended complaint contains no admissible evidence demonstrating that defendants acted with deliberate indifference.

*Plaintiff's Exhibits F, G*

Plaintiff's Exhibit F includes plaintiff's response to defendants' request for admissions.  (ECF No. 61 at 83-88)  Plaintiff's Exhibit G includes plaintiff's responses to defendants' interrogatories.  (Id. at 91-102.)  Plaintiff's responses to defendants' discovery requests contain

19

1   no admissible evidence demonstrating that defendants acted with deliberate indifference.

2        *Plaintiff's Exhibit H*

3        Plaintiff's Exhibit H is plaintiff's request to call inmate Davis and Dr. Oliva as witnesses

4   at trial.  (Id. at 104-126.)  Plaintiff's Exhibit H contains no admissible evidence demonstrating

5   that defendants acted with deliberate indifference.

6        *Plaintiff's Exhibit I, J*

7        Plaintiff's Exhibit I includes defendant Morse's response to plaintiff's request for

8   admissions.  (Id. at 127-136.)  Plaintiff's Exhibit J includes responses to plaintiff's requests for

9   production of documents by defendants Modjtahedi and Stuber.  (Id. at 137-170.)  These

10  responses contain no admissible evidence demonstrating that defendants acted with deliberate

11  indifference.

12       *Plaintiff's Exhibit K*

13       Plaintiff's Exhibit K is plaintiff's request that the court order all parties to submit to

14  polygraph examinations.   (Id. at 171-176.)  The court is not authorized to order parties to submit

15  to polygraph examinations.

16       *Additional Arguments*

17       In his opposition, plaintiff argues that defendants failed to document the profuse bleeding

18  they observed in his left eye.  (ECF No. 58 at 20, 22.)  This claim is speculative and unsupported

19  by the evidence.

20        In his opposition, plaintiff also argues that defendant Stuber injected the Kenalog directly

21  into his eye and not near it.   (Id. at 19-20.)  In support of this claim, plaintiff cites his own

22  responses to requests for admissions and interrogatories.  (Id.)  However, plaintiff was clearly

23  unable to see the injection performed by defendant Stuber.  For this reason, his opinion regarding

24  where the needle was injected is disregarded.  Plaintiff offers no other expert evidence supporting

25  his claim that the needle was injected into the globe of his left eye.

26       In his opposition, plaintiff challenges defendant Morse's opinion that plaintiff's retina

27  could not be reattached because the optic nerve was atrophied and the blood vessels to the retina

28  had poor blood flow.  (Id. at 26-27.)  Plaintiff argues that the blood vessels to his retina had poor

1    blood flow due to the profuse bleeding in his left eye caused by the injection.  (Id. at 27.)

2    Plaintiff has offered no expert evidence to support this claim.

3         In his opposition, plaintiff argues that the 30 gauge needle used by defendant Stuber to

4    perform the February 16, 2011 injection was larger than the 27 gauge needle used by Dr. Zhang

5    who performed the May 2011 injection.  (Id. at 24.)  Plaintiff argues that Dr. Stuber used the

6    wrong size needle.  (Id. at 25.)  Plaintiff provides no expert evidence to support this claim.  As

7    discussed above, defendants have provided expert evidence that defendant Stuber used a correctly

8    sized needle, that was actually smaller than the needle used by Dr. Zhang.

9         In his opposition, plaintiff also argues that he should have received cataract surgery first

10   because it was more risk free than the Kenalog injection.  (Id. at 30.)  However, plaintiff offers no

11   expert evidence in support of this claim.

12        In his opposition, plaintiff also argues that he should have received the surgery for his

13   detached retinal immediately after it was discovered on March 2, 2011.  (Id. at 30.)  As discussed

14   above, according to defendant Morse, the retinal detachment diagnosed on March 2, 2011, did not

15   present the same type of urgency as some types of retinal detachments.  (ECF No. 53-4.)  Plaintiff

16   has provided no expert evidence countering defendant Morse's expert opinion that the decision to

17   perform the surgery on April 12, 2011, rather than when the detached retina was diagnosed on

18   March 2, 2011, was within the standard of care.

19        In his opposition, plaintiff argues that the delay in the surgery until April 12, 2011, caused

20   the retina in his left eye to become inoperable.  (ECF No. 58 at 30.)  Defendant Morse also

21   indicates that the conditions of plaintiff's left eye had deteriorated so much that there was nothing

22   defendants could do to save plaintiff's vision.  In other words, defendant Morse opines that the

23   delay in plaintiff's receipt of surgery did not have any impact on the loss of plaintiff's vision.

24   Plaintiff has offered no expert evidence to counter defendant Morse's expert opinion regarding

25   this matter.

26        *Conclusion*

27        The undersigned is sympathetic to plaintiff and his loss of vision in his left eye.  However,

28   the facts in the record do not support a claim for deliberate indifference in violation of the Eighth

1   Amendment.  Accordingly, for the reasons discussed above, the undersigned recommends that

2   defendants be granted summary judgment as to plaintiff's Eighth Amendment claim.

3   Plaintiff's State Law Claim

4       Plaintiff alleges that defendants committed malpractice in violation of state law.

5   Defendants move for summary judgment as to this claim on grounds that it is barred by the statute

6   of limitation and on the merits.

7       A federal district court may decline to exercise supplemental jurisdiction over state-law

8   claims if the district court has dismissed all claims over which it has original jurisdiction.  28

9   U.S.C. § 1367.  The decision to decline to exercise supplemental jurisdiction under Section

10  1367(c) should be informed by the values of economy, convenience, fairness, and comity.  Acro

11  v. Varian Assoc., Inc., 114 F.3d 999, 1001 (9th Cir. 1997) (en banc).  "[I]n the usual case in

12  which all federal-law claims are eliminated before trial, the balance of factors ... will point toward

13  declining to exercise jurisdiction over the remaining state-law claims."  Carnegie-Mellon Univ. v.

14  Cohill, 484 U.S. 343, 350 (1988).

15      Considering all of the factors, the undersigned recommends that the court decline to

16  exercise jurisdiction over plaintiff's state law claim.  Because no federal claims remain,

17  consideration of plaintiff's state law claims is not warranted.

18      For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendants' motion

19  for summary judgment (ECF No. 53) be granted.

20      These findings and recommendations are submitted to the United States District Judge

21  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

22  after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

25  ////

26  ////

27  ////

28  ////

22

1    objections shall be filed and served within fourteen days after service of the objections.  The

2    parties are advised that failure to file objections within the specified time may waive the right to

3    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

4    Dated:  February 12, 2016

5

6                                                          KENDALL J. NEWMAN
                                                            UNITED STATES MAGISTRATE JUDGE
7    Ba460.57

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                  23